UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| OWEN PATRICK BOYLE, as Administrator of the Estate of TROY J. BOYLE,<br><br>      Plaintiff,<br><br>      v.<br><br>OFFICER SEAN PATRIDGE, in His Individual Capacity, and THE VILLAGE OF STOCKTON,<br><br>      Defendants. | No. 17 C 50121<br><br>Judge Sara L. Ellis |

# OPINION AND ORDER

While responding to a suspicious activity call, Defendant Officer Sean Patridge, a police officer for the Village of Stockton, discharged his weapon and struck Troy J. Boyle twice. Boyle died later that day, and his father, Plaintiff Owen Patrick Boyle, as the administrator of Boyle's estate (the "Administrator"), filed this lawsuit against Patridge and the Village. The Administrator brings a 42 U.S.C. § 1983 claim against Patridge for excessive force, as well as state law wrongful death and survival claims.[1] Patridge has filed a motion for summary judgment. Because factual disputes prevent the Court from determining the reasonableness of Patridge's use of deadly force, the Court denies Patridge's motion.

## BACKGROUND[2]

On Wednesday, March 29, 2017, Patridge, who was on duty in full uniform and driving a marked Village police car, received a suspicious activity call from a Village resident around

---

[1] The Administrator also brought a § 1983 claim against the Village for failure to train, which the Court dismissed. *See* Doc. 30. The Village remains a Defendant solely for indemnification purposes.

[2] The facts set forth in this section are derived from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1. They are taken in the light most favorable to the Administrator, the non-movant.

11:30 a.m. The resident reported a suspicious vehicle parked on a private driveway, with three individuals walking to and from the vehicle with bags to a tree line. The resident also informed Patridge that the individuals were acting erratically and that he did not recognize any of them. Patridge responded to the area and observed three individuals on the south side of Front Avenue on property belonging to Stockton Township. Patridge found one of the individuals, later identified as Timothy Hess, walking eastbound parallel to Front Avenue. Patridge observed the remaining two individuals, later identified as Boyle and Anna Kaiden, walking south toward a shed. Patridge parked his police car, exited, and told Hess to stop. Hess identified himself as Tyler Magee, but Patridge knew Hess was not Tyler Magee. Hess then reported that the other male was Tyler Magee and told Patridge to stop him. As Hess began walking away from Patridge, Patridge grabbed Hess' left arm to place him in handcuffs. When Hess pulled away, Patridge instructed him to stop resisting. Around that time, Jo Daviess County Deputy Sheriff Chad Heidenreich arrived and helped Patridge detain Hess.

Both Patridge and Heidenreich testified that, as Patridge placed handcuffs on Hess, Heidenreich warned Patridge of someone approaching from behind. Patridge testified that he looked over his shoulder and observed Boyle approaching from in front of the shed somewhere between fifteen to twenty-five yards away with his right arm concealed behind his back. Heidenreich agreed that he could not see Boyle's right hand as he approached. Patridge and Heidenreich perceived Boyle's approach with his right hand concealed as threatening.

Patridge testified that he disengaged from Hess and turned to face Boyle, who continued to approach. Patridge indicated he asked Boyle "what is going on" but received no response. Doc. 87-1 at 70:2–3. Patridge testified that Boyle continued to approach with his hand behind his back. Patridge and Heidenreich both testified that they ordered Boyle to show his hands.

2

According to both Patridge and Heidenreich, Boyle did not comply and continued walking, causing Patridge to fear for his life because he thought Boyle had a weapon behind his back. Patridge testified that he then drew his gun and held it in the low-ready position. After Patridge again ordered Boyle to show his hands and Heidenreich told Boyle to stop, Patridge testified that Boyle drew his right arm up from behind him and extended it in a shooting stance toward Patridge, Heidenreich, and Hess. Patridge indicated that he saw a gray object protruding from Boyle's hand, which he thought was a handgun. Heidenreich also testified that he perceived Boyle to point a gun or other weapon at them.

Patridge testified that he feared for his life and the lives of others. To stop the perceived threat, Patridge stated he raised his gun and fired it several times in Boyle's direction. Hess, who initially had his back to Patridge upon hearing the shots, stated that he turned around and saw Boyle with his arms pointed at the officers as if he were holding and shooting a gun at them.[3] Heidenreich testified that when he heard the shots, he grabbed Hess and pushed him behind his squad car to take cover. Patridge testified that he did not know if his initial shots hit Boyle but that he observed Boyle run to his left toward a sand pile located in front of the shed after the first round of shots while continuing to point a gun at Patridge. Patridge stated he paralleled Boyle's movement and fired another round as he retreated to his squad car for cover. Patridge indicated that Boyle reemerged from the sand pile, knelt down, and continued pointing at Patridge. In response, Patridge testified he fired one more shot, after which he observed Boyle slump onto his back. In total, Patridge fired his weapon eight times, with two rounds striking Boyle.

---

[3] The Administrator objects to the use of Hess' affidavit on summary judgment because Patridge produced it after the close of fact discovery. As Patridge points out, the court left discovery open for the purposes of obtaining a deposition of Hess if the parties located him. Once Patridge located Hess, he produced Hess' affidavit over a month before filing for summary judgment. The Administrator did not thereafter seek to take Hess' deposition.

3

Scott Kurth, a mechanic and truck driver for Stockton Township, observed the events from inside a shop on the Township's property, approximately 100 yards from the scene. Kurth testified that he had noticed Hess, Boyle, and Kaiden walking behind the shed on the property before returning to work. When he looked out the window again, he stated he saw Patridge and Heidenreich interacting with Hess. Kurth testified that he then observed Boyle walk up to them and make a motion as if he was getting something out of his trousers. Kurth claimed Boyle got into a shooting stance with his hands clasped together straight in front of his body and his fingers pointing straight out, as if he had a weapon and was shooting at the officers. Kurth did not observe a weapon, however.

Providing a different version of events, Kaiden recalled that after she reached the back of the shed with Boyle, Boyle told her to get down, right before she heard the first set of shots. She testified that Boyle then began pacing back and forth, after a time moving along the side of the shed to the front with his hands out and toward his shoulders at a ninety-degree angle. Kaiden did not recall seeing anything in Boyle's hands. Soon after Boyle reached the front of the shed, at which point Kaiden could no longer see him, Kaiden testified she heard gunshots again. Given how soon Kaiden heard the gunshots after Boyle rounded the corner of the shed, Kaiden did not think Boyle would have had time to put something in his hands before the second set of gunshots. She did recall hearing officers yelling "come out" and "put your hands up" between the two sets of gunfire, with the second set occurring seconds after the commands. After the shooting, Heidenreich located Kaiden behind the shed and secured her.

Boyle died of a bullet wound to his chest. One of the bullets that struck Boyle entered his upper left chest and tracked right and downward. Lance Martini, an expert firearms criminalist,

4

opined that this bullet likely was attributable to one of the first shots Patridge fired.[4] Boyle's autopsy revealed that he had 2900 ng/mL of methamphetamine in his bloodstream. Dr. James Budny, a toxicologist retained by Patridge, testified that this concentration was between five and twenty times more than documented levels that may cause adverse behavior patterns, including loss of behavioral control.

Despite testimony of a perceived weapon, no one recovered a weapon at the scene. Stockton Police Chief Tom Sheehan, who arrived after Patridge called for backup and an ambulance, and Heidenreich both testified that they saw a silver cylindrical object near Boyle's body. When Patridge approached, he also claimed he saw a metallic, cylindrical object. John Love, the ambulance driver, testified that he found a silver object resembling a flashlight and a bull ring near Boyle's body and placed these objects in the back of the ambulance. Love stated that after he transported Boyle to the Freeport Hospital, he did not see the two objects again. But Angela Matthews, an Illinois State Police crime scene investigator, recovered a penlight at the scene. Testing of the penlight did not reveal any suitable latent fingerprints for comparison. A DNA test excluded Boyle from the major DNA profile taken from the silver penlight, with two other DNA profiles deemed unsuitable for comparison. Love did not believe the object he picked up matched the penlight collected by Matthews.

---

[4] The Administrator objects to the Court's consideration of expert bullet trajectory and toxicology testimony at the summary judgment stage, contending such testimony "may be proper before the finder of fact at trial but not at the summary judgment stage." *See, e.g.*, Doc. 89 ¶ 77. Because the Administrator does not explain the basis for this objection and expert testimony is routinely admitted at the summary judgment stage, with the Administrator himself introducing testimony from his experts in his statement of additional facts, the Court includes the expert opinions here. *See DeLuna v. City of Rockford, Ill.*, 447 F.3d 1008, 1012 (7th Cir. 2006) (considering expert testimony on bullet trajectory on summary judgment).

5

Chet Epperson, an expert retained by the Administrator and a former Rockford police chief, opined that Patridge had alternatives he should have explored before using deadly force.[5] Epperson suggested that Patridge should have used his squad car as cover and that he improperly assessed Boyle as a threat where Patridge did not witness any muzzle flash or return fire.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[5] Patridge argues that the Court should strike Epperson's report and bar his opinions on summary judgment and at trial, claiming that Epperson's opinions conflict with caselaw. At this stage, without a response on the issue from the Administrator, the Court considers Epperson's opinions in light of the relevant caselaw on an officer's use of deadly force and the history of this case and leaves a complete admissibility determination for trial.

## ANALYSIS

**I.   Excessive Force Claim**

Patridge argues that he is entitled to summary judgment on the Administrator's excessive force claim because his actions did not violate the Fourth Amendment or, alternatively, because qualified immunity protects him from liability. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, --- U.S. ----, 137 S. Ct. 548, 551 (2017) (citation omitted) (internal quotation marks omitted). "In other words, qualified immunity shields from liability [defendants] who act in ways they reasonably believe to be lawful." *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (quoting *Jewett v. Anders*, 521 F.3d 818, 822 (7th Cir. 2008)) (internal quotation marks omitted). Once raised by the defendant, "a plaintiff must show (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time so that it would have been clear to a reasonable officer that her conduct was unlawful in the situation." *Id.*

The Fourth Amendment's prohibition on unreasonable seizures limits an officer's use of deadly force. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To determine the reasonableness of the use of force, the Court reviews the totality of the circumstances and "engage[s] in 'a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395–96 (1989)). When balancing these competing factors, the Court considers "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396). The Court evaluates reasonableness from the "perspective of a reasonable officer on the scene" and not with "20/20" hindsight. *Graham*, 490 U.S. at 396.

In cases of deadly force, "[w]hen an officer reasonably believes an assailant's actions place 'him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force.'" *Horton*, 883 F.3d at 949 (quoting *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988)). Patridge argues that the circumstances known to him at the time of the shooting made his decision to use deadly force objectively reasonable. Patridge relies on his testimony that Boyle advanced towards him with a hand behind his back, refused Patridge's commands to show his hands, and then took a shooting stance. Patridge supports his own testimony with that of Heidenreich, Hess, and Kurth, all of whom testified to some variation of Patridge's version of the events. According to Patridge, the facts demonstrate that Boyle posed a threat, making his use of deadly force reasonable. *See, e.g.*, *Cooper v. City of Rockford*, No. 06 C 50124, 2010 WL 3034181, at *9 (N.D. Ill. Aug. 3, 2010) (finding officer's use of deadly force reasonable where decedent "pretended to threaten [the officer] with a gun").

Were this the only possible version of the events in the record, the Court would agree that the jury could only come to the conclusion that a reasonable officer would have believed Boyle posed a threat so as to make the use of deadly force reasonable. *See Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985) ("[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."). But the record includes another version of the

incident, which creates disputes of fact that a jury must resolve. *See Ball v. Cortes*, No. 11-cv-8741, 2018 WL 925130, at *6 (N.D. Ill. Feb. 16, 2018) (distinguishing cases finding for defendant on excessive force claim, including *Cooper*, because in those cases, "the threat posed to the defendant police officers was undisputed"). Specifically, Kaiden's testimony calls into question the entire sequence of events.[6] At her deposition, Kaiden testified that she heard the first set of shots ring out while she was behind the shed with Boyle, after which she observed Boyle pacing back and forth and ultimately moving toward the street with his arms extended out at a ninety-degree angle. Although Kaiden lost sight of Boyle before she heard a second round of shots, she testified that she did not see Boyle with anything in his hands and that he would not have had time to pull something out before the second set of shots rang out. Kaiden's story challenges the sequence of events, Boyle's location, the positioning of his arms, and whether he held anything in his hands. Patridge argues that the Court should not give weight to Kaiden's testimony given her location behind the shed, but only a jury can consider how her line of sight affects her testimony. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."). And under Kaiden's version of the events, a jury could conclude that Patridge's use of deadly force was unreasonable. *See Coleman v. Wiencek*, No. 08 C 5275, 2010 WL 1506708, at *5 (N.D. Ill. Apr. 13, 2010) (refusing to grant summary judgment where, under one version of events, a reasonable jury could find that decedent did not pose a threat so as to make use of deadly force reasonable).

---

[6] Patridge argues that, notwithstanding Kaiden's conflicting testimony, the Administrator admits the pertinent facts in his version of the events, including that Boyle drew his arms into a shooting stance pointed in the officers' direction before Patridge fired any shots. The Court understands the Administrator to admit that Patridge, Hess, Heidenreich, and Kurth testified to certain facts at their depositions but to dispute that version of events given Kaiden's testimony about the incident.

9

Because the Administrator's version of the facts reasonably lays out a constitutional violation, while Patridge's does not, the competing narratives prevent the Court from accurately judging the totality of the circumstances and instead require the Court to submit this issue to a jury. *See Weinmann*, 787 F.3d at 449 (refusing to find officer acted reasonably where the critical facts were disputed). As the Seventh Circuit has recognized, "summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations," with the principle "particularly relevant where, as here, the one against whom force was used has died, because the witness most likely to contradict the officer's testimony—the victim—cannot testify." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010). And because jury questions exist about the circumstances surrounding Patridge's use of force and the potential threat Boyle posed, the Court cannot resolve the qualified immunity question in Patridge's favor at this time. *See Strand v. Minchuk*, 910 F.3d 909, 918 (7th Cir. 2018) ("[A] dispute of fact regarding the circumstances surrounding an officer's use of force may prevent us from determining whether an individual's clearly established rights have been violated."); *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) ("When the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial."); *Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008) (factual disputes concerning the degree to which suspect became agitated and threatening in speaking to officer and whether suspect made physical contact with officer prevented summary judgment on qualified immunity grounds).

## II.  State Law Claims

In addition to the federal excessive force claim, the Administrator seeks recovery under Illinois' wrongful death and survival statutes, 740 Ill. Comp. Stat. 180.01 *et seq.* and 755 Ill.

Comp. Stat. 5/27-6. In seeking summary judgment on these claims, Patridge invokes the Illinois Tort Immunity Act, which provides that a "public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 Ill. Comp. Stat. 10/2-202. Essentially for the same reasons he claims he is entitled to summary judgment on the excessive force claim, Patridge argues that his actions cannot amount to willful and wanton conduct. But because the Administrator's Fourth Amendment claim survives given the disputes of fact as to the circumstances surrounding the shooting, the Administrator's wrongful death and survival claims also survive. *See Childs v. City of Chicago*, No. 13-CV-7541, 2017 WL 1151049, at *10 (N.D. Ill. Mar. 28, 2017) ("[T]he plaintiff's survival and wrongful death claims depend on Childs' ability to recover under the Fourth Amendment through § 1983."); *cf. Ybarra v. City of Chicago*, 946 F.3d 975, 981 n.1 (7th Cir. 2020) ("For the same reasons that the officers' use of deadly force was reasonable as a matter of law, a jury could not conclude that their use of deadly force was willful and wanton.")

## CONCLUSION

For the foregoing reasons, the Court denies Patridge's motion for summary judgment [85].

Dated: February 21, 2020

SARA L. ELLIS
United States District Judge

11